# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| WILLIAM RAVELING,<br><br>Plaintiff,<br><br>vs.<br><br>TYSON FOODS, INC., et al.,<br><br>Defendants. | No. C14-4058-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## I.   INTRODUCTION

This case is before me on defendants' motion (Doc. No. 24) for summary judgment. Plaintiff has filed a resistance (Doc. No. 39) and defendants have filed a reply (Doc. No. 47). No party requested oral argument. The motion is fully submitted and ready for decision.

## II.   PROCEDURAL HISTORY

Plaintiff William Raveling ("Raveling") filed this action in the Iowa District Court for Cherokee County on June 3, 2014, and filed a first amended petition (Doc. No. 2) on June 19, 2014. The named defendants are Tyson Foods, Inc., d/b/a Tyson Deli, Inc., and Tyson Deli, Inc. (collectively "Tyson"). Raveling alleges that he was employed by Tyson at its plant in Cherokee, Iowa, until being discharged. He further alleges that the discharge was based on his age in violation of the Age Discrimination in Employment Act (ADEA) and the Iowa Civil Rights Act (ICRA).

On July 10, 2014, Tyson filed a notice (Doc. No. 1) of removal to this court. Tyson then filed a motion (Doc. No. 4) to dismiss for failure to state a claim, while Raveling filed a motion (Doc. No. 5) to remand the action to state court. On September

9, 2014, United States District Judge Mark W. Bennett filed an order (Doc. No. 8) denying the motion to remand and granting the motion to dismiss. However, Judge Bennett gave Raveling leave to file an amended complaint to plead his claims adequately. Doc. No. 8 at 11-12.

Raveling filed his amended complaint (Doc. No. 9) on October 9, 2014. Tyson then filed an answer (Doc. No. 14) denying Raveling's claims. This case was referred to me (Doc. No. 12) on October 22, 2014, after the parties unanimously consented to trial, disposition and judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Discovery closed August 31, 2015, and trial is scheduled to begin February 8, 2016. *See* Doc. Nos. 18, 19.

### III. RELEVANT FACTS

Except as otherwise noted, the following facts are not in dispute:

Raveling began working at Tyson's Cherokee plant in 1972. For about 20 years, he worked on a production line. In 1993, he was promoted to a salaried position as production supervisor. Several years before his employment ended, Raveling was assigned to be the production supervisor in the plant's Sausage South area. This area was sometimes called the "hot dog room," as hot dogs were the only product made there.

By 2011, the Cherokee plant was failing and Tyson's management was taking steps to improve operations in an effort to save it. *See, e.g.*, Doc. No. 24-4 at 14. Raveling understood that Tyson had high standards and was demanding of all its employees. *Id*. at 11. On April 12, 2012, Howard Nelson (a supervisor who was older than Raveling) issued what he called a "Last warning" to Raveling. Doc. No. 25-1 at 2. The document directed Raveling to "[p]ay attention to inventories" and stated that Raveling was using newer meat on his line instead of rotating the inventory to use older meat first. *Id*. The document also referenced the fact that Tyson was "tanking" some meat for

being old. *Id*. Raveling was told: "Hold your team members accountable or you are accountable." *Id*. Raveling does not contend Nelson issued the warning because of Raveling's age. Doc. No. 24-4 at 10.

On August 31, 2012, Shane Graybill, a plant superintendent, issued a written counseling note indicating that he had advised Raveling to be on the production floor by 5:30 a.m. each day to make sure his department would be ready to start production on time. Doc. No. 24-6 at 2. A series of events then occurred in early January of 2013 that led to Tyson imposing discipline on Raveling. According to Tyson, the events included: (a) Raveling failed to follow directions to use "rework"[1] on his production line during the week of January 5, 2013; (b) on January 9, 2013, the frank-o-matic machine was down and Raveling did not follow up with maintenance or plant management to fix it; (c) on the same day, the production line was down and Raveling had left the area to smoke; (d) on January 10, 2013, Raveling left work without finishing paperwork; (e) the next day, Raveling called in sick because he was mad; and (f) on January 12, 2013, Raveling again left without completing paperwork. Doc. No. 24-6 at 3-4. On January 15, 2013, Tyson issued a written warning, suspended Raveling for three days and advised him that he would be placed on a performance improvement plan (PIP). *Id.* at 4. Raveling was cautioned that any failure to meet the PIP's requirements would result in discharge and that his continued employment would be reviewed on February 15, 2013. *Id*.

Upon his return from suspension, Raveling had weekly meetings with Wes Giebelman, a plant superintendent, and Kendra Saunders, the plant's human resources manager, to discussion his compliance with the PIP. Doc. Nos. 47-3 through 47-6.

---

[1] "Rework" is product that does not meet specifications for some reason but can be blended with other product instead of destroyed.

For the week ending February 1, 2013, Tyson noted two failures to comply with PIP requirements. Doc. No. 47-4 at 2. Two additional failures were noted the following week. Doc. No. 47-5 at 2. For the week ending February 15, 2013, three failures were noted. Doc. No. 47-6 at 2. One issue involved Raveling's alleged failure to follow a directive to place shrink wrap over products on pallets to reduce foreign material exposure. *Id.* When Raveling was asked why he did not comply with this order, he allegedly stated that "his operators did not feel it necessary." *Id.* Raveling testified that Dan Hacker, a night superintendent, directed that all of the pallets be wrapped but that Raveling's line operators did not agree with the requirement. Doc. No. 24-4 at 4-5. He acknowledges that he sided with his operators on this issue and, therefore, did not follow Hacker's order. *Id.* at 5. He testified that he understood why this noncompliance would cause Hacker to be frustrated. *Id.* at 25.

Tyson placed Raveling on indefinite suspension on February 15, 2013. Doc. No. 24-8 at 2. The stated reason was failure to meet the expectations set forth in the PIP. *Id.* On February 18, 2013, Tyson advised Raveling that the indefinite suspension was being changed to discharge. *Id.*

Raveling has explanations for the various infractions alleged by Tyson. *See, e.g.*, Doc. No. 39-1 at 5-11. He disagrees with some of the allegations and, with regard to others, argues that they occurred through no fault of his own. *Id.* Raveling contends that the PIP "was structured to set him up for failure." *Id.* at 11. He does not, however, claim to have evidence that the concerns expressed by Tyson's management were insincere or were based on Raveling's age:

> Q. Now, sir, we've had concerns like this expressed by Mr. Graybill, Mr. Nelson and Mr. Giebelman; correct?
>
> A. Correct.

> Q. And so you have an employee in his 40s, 50s and 60s all expressing those concerns; correct?
>
> A. Yes.
>
> Q. Do you have any indication that those concerns were not genuinely held by those people?
>
> A. No.
>
> Q. Do you have any indication that those concerns that are being raised were motivated by your age in any way?
>
> A. No.

Doc. No. 24-4 at 20. Also:

> Q. And do you have any reason to dispute that Mr. Giebelman at least believed what was in [the written warning and suspension letter]?
>
> A. Do I dispute what Giebelman put in this?
>
> Q. No. As far as you know, did Wes believe what he put in this memo?
>
> A. Yes.
>
> Q. Now, you would disagree with some of it or think it was unreasonable; correct?
>
> A. Yes.
>
> Q. But as far as you know, you thought Wes believed it; right?
>
> A. Yeah. Yes.

5

> Q. And you knew a performance improvement plan was telling you you needed to improve your performance or you were going to be gone; correct?
>
> A. Yes.

*Id.* at 23. Finally:

> Q. And as far as you know, Mr. Giebelman genuinely felt you had not met his expectations on the performance improvement plan; correct?
>
> A. Yes.
>
> Q. He was dissatisfied with your performance; correct?
>
> A. Yes.

*Id.* at 24. Additional facts will be discussed as necessary in analyzing the parties' arguments.

## IV. *SUMMARY JUDGMENT STANDARDS*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are

"critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id*. However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

No unique summary judgment standards apply to employment discrimination cases. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (en banc) (rejecting prior decisions that applied a "discrimination case exception" to the analysis of summary judgment motions). However, as Judge Bennett has aptly explained, applying summary judgment standards to the motivation-intensive elements present in most employment discrimination cases is not a simple task:

> Employment discrimination and retaliation, except in the rarest cases, are difficult to prove. They are perhaps more difficult to prove today—fifty years after the passage of the EPA, more than forty years after the passage of Title VII and the ADEA, more than twenty years after the passage of the ADA, and nearly two decades after the passage of the FMLA—than during the earlier evolution of these anti-discrimination and anti-retaliation statutes. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697–98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank*,

> *FSB v. Vinson*, 477 U.S. 57, 65–67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).
>
> My experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective. *See, e.g.*, *id*. Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, the EPA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g.*, *id*. On the other hand, it is also relatively easy for disgruntled former employees to claim a protected basis under federal and state anti-discrimination laws as a reason for their discharge when in fact they played no part. This is true even when the former employee and/or their counsel believe they did. This is what makes deciding these issues on a paper record daunting.

*Pick v. City of Remsen*, No. C13-4041, 2014 WL 4258738, at *12 (N.D. Iowa Aug. 27, 2014). While the task can indeed be daunting in an employment discrimination case, "the focus of inquiry at the summary judgment stage 'always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic].'" *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1018 (8th Cir. 2005) (quoting *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1336-37 (8th Cir. 1996)).

## V. ANALYSIS

### A. *Applicable Standards*

The ADEA and the ICRA prohibit discrimination against employees because of age. 29 U.S.C. § 623(a); Iowa Code § 216.6. If there is no direct evidence of discrimination, age discrimination claims are analyzed under the *McDonnell Douglas*[2] burden-shifting framework. *Holmes v. Trinity Health*, 729 F.3d 817, 821 (8th Cir. 2013); *Hulme v. Barrett*, 449 N.W.2d 629, 631-32 (Iowa 1989). The Eighth Circuit Court of Appeals describes the *McDonnell Douglas* framework, as applied to ADEA and ICRA claims, as follows:

> At the first step of the analysis, the plaintiff has the burden of establishing a prima facie case of age discrimination. . . . A successful showing creates a presumption that the employer unlawfully discriminated against the plaintiff and shifts the burden to the burden to the employer to articulate a legitimate nondiscriminatory reason for its actions. . . . If the employer meets this burden, the presumption of discrimination dissolves and the burden returns to the plaintiff to demonstrate that the proffered reason is a mere pretext for age discrimination.

*Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir. 2013) [citations omitted]. The elements of a prima facie age discrimination claim vary depending on the nature of the claim. When the plaintiff contends that a hiring or promotion decision was based on age, the prima facie elements are: (1) plaintiff was at least 40 year old at the time of the challenged decision, (2) plaintiff was not hired (or was not promoted) and (3) plaintiff was qualified for the job. *Hilde v. City of Eveleth*, 777 F.3d 998, 1004 (8th Cir. 2015). As the *Hilde* panel noted, the Eighth Circuit sometimes includes a fourth factor as being

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

that the employer hired a younger person to fill the position. *Id.* (citing *Tusing v. Des Moines Indep. Comm. School Dist.*, 639 F.3d 507, 515 (8th Cir. 2011)).

When the plaintiff alleges a discharge based on age, the prima facie elements are (1) plaintiff was at least 40 year old, (2) plaintiff suffered an adverse employment action, (3) plaintiff was meeting the employer's legitimate expectations at the time of the adverse employment action, and (4) plaintiff was replaced by someone substantially younger. *Holmes v. Trinity Health*, 729 F.3d 817, 822 (8th Cir. 2013) (citing *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 856 (8th Cir.), *cert. denied*, 133 S. Ct. 313 (2012)).

If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory explanation for the decision. *Ridout*, 716 F.3d at 1083; *see also Hilde*, 777 F.3d at 1004. Once such an explanation is offered, the burden shifts back to the plaintiff to provide evidence that the explanation is pretextual. *Hilde*, 777 F.3d at 1004. At the summary judgment stage, a plaintiff must point to "enough admissible evidence to raise a genuine doubt as to the legitimacy of the defendant's motive, even if that evidence [does] not directly contradict or disprove [the] defendant's articulated reasons for its actions." *Wierman v. Casey's General Stores*, 638 F.3d 984, 995 (8th Cir. 2011) (pregnancy discrimination claim) (quoting *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005) (internal quotation omitted)). "Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact as to whether the termination was motivated by intentional discrimination." *Burton v. Arkansas Sec. of State*, 737 F.3d 1219, 1230 (8th Cir. 2013) (race discrimination claim) (quoting *Bone v. G4S Youth Services, L.L.C.*, 686 F.3d 948, 955 (8th Cir. 2012) (internal quotation omitted)).

Pretext can be established by (1) "persuading the court that a discriminatory reason more likely motivated the employer", *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1046 (8th Cir. 2010), (2) "showing that the employer's proffered reason is unworthy of

credence," *id.*, (3) showing that it was unlikely an employer would have acted on the basis of the proffered reason," *Ridout*, 716 F.3d at 1084, (4) showing the proffered reason was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case, *id.*, or (5) presenting evidence that the employer's proffered reason has changed substantially over time. *Jones*, 608 F.3d at 1046.

A plaintiff may also show pretext through "comparator evidence," which involves showing that a younger employee, similarly situated to plaintiff, was treated more leniently when he or she committed an infraction of comparable seriousness. *Ridout*, 716 F.3d at 1084-85. The comparator employee need not have engaged in the exact same offense, only one of "comparable seriousness." *Id.* Where evidence demonstrates that the comparator employee was disciplined differently, a factfinder may decide whether the different treatment is attributable to discrimination or some other cause. *Id.* Regardless of how the plaintiff shows pretext, the showing requires more than merely discrediting an employer's asserted reasoning for terminating an employee. *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 470 (8th Cir. 2011). A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus. *Id.*

Under the ADEA, a plaintiff must show that age was a "but-for" cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). Under the ICRA, a plaintiff must only show that age "played a part" in the adverse employment decision and need not prove age was the only reason. *Newberry v. Burlington Basket Co.*, 622 F.3d 979, 982 (8th Cir. 2010) (citing *DeBoom v. Raining Rose Inc.*, 772 N.W.2d 1, 13 (Iowa 2009)).

## B. Discussion

Raveling acknowledges that he has no direct evidence of age discrimination. Doc. No. 39-1 at 13. As such, his claim must be evaluated pursuant to the *McDonnell Douglas* framework.

### 1. *Prima Facie Case*

Tyson contends Raveling has failed to establish a prima facie case of discrimination because he cannot show he was meeting Tyson's legitimate expectations. Tyson points to Raveling's alleged failure to comply with the PIP's requirements, his acknowledgment that Giebelman had a sincere belief that Raveling's performance was unsatisfactory and, finally, Raveling's admission that he intentionally failed to comply with Hacker's order to shrink wrap the pallets. Raveling disagrees and argues that there is a genuine issue of fact for the jury as to whether he was meeting expectations at the time of his discharge.

The standard for assessing performance "is not that of the ideal employee, but rather what the employer could legitimately expect." *Keathley v. Ameritech Corp.*, 187 F.3d 915, 920 (8th Cir. 1999). Even if an employee was meeting some expectations, that employee cannot establish a prima facie case if he or she was not meeting other significant expectations. *See, e.g.*, *Ziegler v. Beverly Enterprises–Minnesota, Inc.*, 133 F.3d 671, 676 (8th Cir. 1998). Here, I agree with Tyson that there is little evidence – if any – that would allow reasonable jurors to find for Raveling on this issue. However, the burden of establishing a prima facie case is not onerous, as the purpose of the prima facie showing is to eliminate the most common nondiscriminatory reasons for the employer's decision. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981); *see also Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009).

Moreover, the question of whether Raveling was meeting Tyson's legitimate expectations overlaps substantially with the next steps of the *McDonnell Douglas*

framework. Therefore, I find it appropriate to move on and consider whether genuine issues of material fact exist as to whether Tyson's stated reason for discharge was mere pretext for age discrimination. For purposes of Tyson's motion for summary judgment, I will assume that Raveling can establish a prima facie case.

### 2. *Has Raveling Presented Evidence Discrediting Tyson's Explanation?*

Raveling does not dispute that Tyson has offered a legitimate, nondiscriminatory reason for discharging him – poor job performance. However, Raveling contends that this reason is false. He bases this argument on (a) the fact that other older workers were also discharged or put on PIPs and (b) his disagreement with his alleged violations of his own PIP. Doc. No. 39-1 at 11-12, 16-18. I will address these issues separately.

#### a. *Other Older Workers*

Raveling relies on instances in which other older workers at Tyson were discharged and/or put on PIPs. *Id.* at 11-12. He identifies a total of ten workers, ranging in age from 41 to 65, who allegedly fall into this category. *Id.* at 12. However, he does not develop an argument as to the significance of this information. It is undisputed that the Cherokee plant was failing during this period of time and that Tyson was seeking to save the plant by improving operations. Under these circumstances, is it surprising that some number of employees who happened to be above the age of 40 were put on PIPs and/or were discharged? Raveling seems to think so, but he does not explain why. How many older employees were *not* put on PIPs? Raveling does not say. In isolation, a list of ten older employees is meaningless.

Moreover, Raveling presents no evidence that Tyson treated younger employees more favorably during this period of time. Were some younger employees put on PIPs? Were some discharged after failing to comply with PIPs? If so, how do the percentages

compare to older employees during the relevant period of time?  Raveling does not answer these questions.

Meanwhile, Tyson points out (a) that the percentage of younger employees (those under the age of 40) at the Cherokee plant actually decreased each year from 2011 until the plant closed in 2014 and (b) that even after Raveling was discharged, more than half the plant's production supervisors were over the age of 40.  Doc. No. 47 at 10 (citing Doc. No. 24-10 at 2 and Doc. No. 39-22 at 3).  Thus, the only plant-wide statistical evidence of record does not suggest an effort by Tyson to purge older workers.  The fact that Raveling has been able to name ten other, older employees who were allegedly discharged and/or placed on PIPs does nothing to prove that Tyson's stated reason for terminating his employment was false.

### b. *Disputed PIP Violations*

This leaves only Raveling's challenges to the alleged PIP violations.  With regard to some incidents, he argues that Tyson got the facts wrong, thus incorrectly finding that a violation occurred.  Doc. No. 39-1 at 17.  For some others, he admits that mistakes were made but claims that others were wholly, or at least partially, to blame.  *Id*. at 17-18.  As for the "shrink wrap" incident, in which he admits that he chose to disregard a directive from a supervisory employee, he now states that he "put off the shrink wrapping job until he had sufficient workers so as not to reduce production."  *Id*. at 18.[3]

---

[3] Raveling advances this reason for noncompliance in the declaration filed in resistance to Tyson's motion for summary judgment.  Doc. No. 39-10 at 9.  However, there is no evidence he advised Giebelman of this explanation during the PIP review meeting.  Tyson's memo about that meeting states that when Raveling was asked about the failure to shrink wrap the pallets, he stated that "his operators did not feel it necessary."  Doc. No. 47-6 at 2.  Raveling's deposition testimony about the incident does not indicate that he advised Tyson of any belief that he lacked the necessary number of workers to shrink wrap the pallets.  Doc. No. 24-4 at 4.

Even if I were to assume that Raveling is right, and that Tyson's findings as to each PIP violation were factually wrong, that assumption would not help Raveling. As the Eighth Circuit explained in a case in which an employee was discharged for fighting:

> Hitt urges that there is a genuine issue of fact as to whether he was actually fighting with Odom during the incident that led to termination. He asserts that Odom kicked him, but that he never engaged in fighting or impermissible aggressive behavior. Hitt relies on Imhof's alleged admission that he was "misinformed" about the incident when he made the decision to terminate Hitt for fighting. The difficulty with this contention is that it focuses on the wrong question. <u>The key question in a discrimination case like this one is not whether Hitt was truly fighting, but whether the employer really *believed* that he was fighting, such that the termination was based on a non-discriminatory reason</u>. *Scroggins v. Univ. of Minnesota*, 221 F.3d 1042, 1045 (8th Cir. 2000). It is undisputed that eyewitnesses reported to Harsco supervisors that Hitt threatened force against Odom in the break room, and then threw a punch at Odom when the two moved outside. These undisputed facts provided Harsco with a legitimate, non-discriminatory basis for termination, even if Hitt could now show that the witnesses were wrong in what they reported about the altercation.

*Hitt v. Harsco Corp.*, 356 F.3d 920, 924-25 (8th Cir. 2004) [italics in original; underlining added]. Here, as noted above, Raveling concedes that his supervisors at Tyson genuinely believed he was not meeting expectations and had violated the PIP's requirements. Doc. No. 24-4 at 20, 23-24. Thus, and like the plaintiff in *Hitt*, Raveling's focus on the factual accuracy of each violation is misplaced. The relevant question is whether Tyson had a genuine belief that Raveling had failed to comply with the PIP. The answer, as a matter of law, is "yes." Raveling's challenge to the factual merits of the alleged violations does not establish that Tyson's stated reason for discharge is false.

### *3. Has Raveling Presented Evidence of Discriminatory Animus?*

Even if Raveling had evidence casting doubt on Tyson's stated reason for discharge, such evidence would not end the inquiry. The Eighth Circuit has stated:

> The showing of pretext necessary to survive summary judgment "requires more than merely discrediting [defendant's] proffered reason for the adverse employment decision. [Plaintiff] must also prove that the proffered reason was a pretext for age discrimination."

*Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 898 (8th Cir. 2004) (quoting *Spencer v. Stuart Hall Co.*, 173 F.3d 1124, 1128 (8th Cir. 1999)); *see also Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (to create a genuine issue of material fact on pretext "the ultimate question is whether the plaintiff presents evidence of 'conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision ....' ") (quoting *Feltmann v. Sieban*, 108 F.3d 970, 975 (8th Cir. 1997)). Thus, Raveling would also have to present evidence allowing the jury to find that his age was what actually motivated Tyson's decision.

The record contains no evidence of age bias on the part of anyone involved in the decision to terminate Raveling's employment. Raveling testified that he is not aware of plant superintendent Giebelman making any inappropriate age-related comments and has no indication that Giebelman was biased based on age. Doc. No. 24-4 at 7. While Raveling testified that all supervisors (apparently regardless of age) had "some issues" with Giebelman, he explained that this was because Giebelman was "harsh" and was perceived to lack experience. *Id.* at 6. When asked about various management team members who raised concerns about his performance, Raveling admitted having no reason to believe that those concerns were raised because of his age. *Id.* at 20.

Raveling also acknowledged that he was not aware of anyone at Tyson who made negative comments based on age. *Id.* at 11.

In short, Raveling has not presented evidence that would permit reasonable jurors to find that Tyson's stated reason for discharge was false. Nor has Raveling presented evidence that would permit reasonable jurors to find that the discharge was actually based on his age. As such, Raveling's claims of age discrimination fail as a matter of law.

## VI. CONCLUSION

For the reasons set forth herein:

1. Defendants' motion (Doc. No. 24) for summary judgment is **granted** with regard to all claims.

2. Judgment shall enter against plaintiff William Raveling and in favor of defendants Tyson Foods, Inc., d/b/a Tyson Deli, Inc., and Tyson Deli, Inc.

3. The trial of this case, which is currently scheduled to begin February 8, 2016, is **canceled**.

4. Because this order disposes of all pending claims, this case is **closed**.

**IT IS SO ORDERED.**

**DATED** this 21st day of December, 2015.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE